# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MARLON A. DISMUKE, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-14-2546 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| *Acting Commissioner of the Social* | § | |
| *Security Administration,* | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is a motion for summary judgment filed by plaintiff Marlon Dismuke.  Dkt. 17.  Also pending is a cross-motion for summary judgment filed by defendant Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration (the "Commissioner").  Dkt. 20.  After considering the motions, responsive briefing, record, and applicable law, the court finds that Dismuke's motion (Dkt. 17) should be **GRANTED**, and the Commissioner's motion (Dkt. 20) should be **DENIED**.  This case is **REMANDED** to the Social Security Administration for further proceedings.

## I. BACKGROUND

Dismuke filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner regarding Dismuke's claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (the "Act").

A.      **Medical History**

Dismuke was born on January 31, 1969.  Tr. at 187.[1]  He has been incarcerated five times for a total of twenty-three years, dating back to the mid-1980s, and was most recently released in October 2012.  *Id.* at 4529.  In December 1988 he was diagnosed with Human Immunodeficiency Virus ("HIV").  *Id.* at 4534.  Dismuke has been diagnosed with schizophrenia, depression, bipolar disorder, major depressive disorder, polysubstance dependance, and antisocial personality disorder. *Id.* at 1020, 4530.

While incarcerated, Dismuke began experiencing depression, suicidal thoughts, and hallucinations.  *Id.* at 4528.  Dismuke has a history of difficulties interacting with others:  He reported that he was in multiple fights in prison, was fired from a job in 2006 after he was in a fight with a manager, was fired from a job at a grocery store in high school after he threatened a supervisor, and once stabbed a roommate, allegedly in self-defense, and was sentenced to two years in jail.  *Id.* at 4528.  Dismuke reported to a psychologist that he often felt slighted by others and easily took offense to other's behaviors.  *Id.* at 1019.  He displayed paranoid thinking and difficulty controlling anger when dealing with other people.  *Id.*  Dr. Audre Muehe opined that the significant gap between Dismuke's verbal IQ and performance IQ scores was suggestive of hemispheric dysfunctioning.  *Id.* at 1021.

On March 12, 2013, after a six-week unsanctioned hiatus from his HIV medication, Dismuke's CD4 count was measured at 202, down from 574, and his viral load had increased

---

[1]  "Tr." refers to the certified administrative transcript filed as docket entry 9 and its attachments.

significantly.[2]  *Id.* at 1119.  After increasing his HIV medication, his CD4 count improved to 449 by June 2013.  *Id.* at 4269.  Dismuke complained that his HIV medication side effects included diarrhea and rectal bleeding, acid reflux, dizziness, drowsiness, and neuropathy.  *Id.* at 197, 1029.

Also on March 12, 2013, Dismuke attempted suicide by medication overdose.  *Id.* at 4415.  Dismuke stated he had taken twenty to twenty-five perphenazine tablets.  *Id.* at 4415.  He stated that he had homicidal ideation towards an unnamed individual but that he did not want to go to prison, so he had decided to kill himself instead.  *Id.*  Secondary to his homicidal ideation, Dismuke cited his declining health related to his HIV as a reason for his suicide attempt.  *Id.*

In May 2013, Dismuke was discharged after spending thirty days in a drug recovery center.  *Id.* at 4267, 4468.  After leaving the recovery center, Dismuke reported that he had experienced suicidal thoughts, saw visual hallucinations of animals, displayed paranoid thinking, and had lost forty pounds in approximately six months.  *Id.* at 4276.

On November 26, 2013, Dr. Jesse Reed performed a consultive evaluation of Dismuke on behalf of the SSA.  *Id.* at 4524-30.  Reed noted that Dismuke suffered from poor judgment and insight and noted that Dismuke suffered from antisocial personality disorder.  Tr. 4530.  Although he did not note any other impairments, Reed found that Dismuke suffered from extreme limitations when interacting with the public, supervisors, co-workers, or changes in routine settings, citing Dismuke's legal history and his interview with Dismuke regarding his ability to interact with others.  *Id.* at 4525.

---

[2] "CD4 count" refers to the number of CD 4 T lympocytes in an individual's blood. A healthy CD4 count ranges between 500 and 1200, while a count below 200 is one of the methods used to determine that HIV has progressed to AIDS.  What is a CD4 Count and Why is It Important?, AIDS.GOV (Mar. 17, 2016), https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/.

**B.  Application to the Social Security Administration**

Dismuke filed his application for SSI benefits on October 12, 2012, alleging that he was disabled due to HIV, depression, and anxiety.  *Id.* at 187, 190.  His alleged onset date was August 1, 2006.  *Id.* at 187.

On February 12, 2013, Dismuke's SSI application was denied.  *Id.* at 108-18.  On April 15, 2013, he requested reconsideration.  *Id.* at 123–25.  The application was reconsidered and subsequently denied on July 1, 2013.  *Id.* at 107.  Dismuke requested a hearing on August 5, 2013. *Id.* 138-51.

**C.  Hearing**

Dismuke's hearing was conducted on November 1, 2013, in Houston, Texas, and presided over by administrative law judge Mark Dowd (the "ALJ").  *Id.* at 33.  Dismuke testified that he had no work history and that he had been out of prison for just over a year.  *Id.* at 35.

Dismuke testified that some of his medication stopped working effectively in early 2013, causing his viral load to increase and his CD4 count to decrease.  *Id.* at 36.  He testified that his symptoms included chronic diarrhea, fatigue, drowsiness, and acid reflux, and that he was given over-the-counter medication that was occasionally effective at treating acid reflux.  *Id.* at 37-38.  He also stated he experienced neuropathy-like symptoms in his shoulder.  *Id.* at 39.  He testified that he began experiencing hallucinations while in prison, including seeing bugs and rats.  *Id.* at 39-40. Dismuke admitted to multiple suicide attempts, most recently in March 2013.  *Id.* at 40-41.  He testified that he had not used drugs since he completed a rehabilitation program in April 2013.  *Id.* at 41.  Dismuke admitted to having problems with authority figures, and stated that if he felt he was being bullied or intimidated, he would sometimes react with violence.  *Id.* at 44.  He testified that

4

he had tried to work in the kitchen and laundry in prison, but he was fired from the kitchen because he could not get along with the sergeant, and he was told not to return, even to pick up his clothes, following an argument with a laundry room supervisor. *Id.* at 45.

Dismuke testified that he carried prayer beads with him and that he used them to "stay vigilant" so that he would not "do something crazy." *Id.* at 58. He indicated that he would use the beads when he was around other people. *Id.*

Dismuke testified that he had side effects on a daily basis, and that he took on average two-to-three naps per day for an hour to an hour and a half each to treat chronic fatigue. *Id.* at 68. He stated that he had recently experienced sores on his skin, and that he would occasionally have episodes of "thrush," most recently in February 2013. *Id.* at 70.

The ALJ then asked the vocational expert (the "VE") whether a hypothetical individual capable of work at all exertional levels but limited to simple, routine tasks performed in a work environment absent fast-paced production requirements, involving only simple decisions, and with only occasional coworker interaction or interaction with the public would be able to find work. *Id.* at 73. The VE stated that such an individual would be able to work as a janitor, office cleaner, or laundry worker. *Id.* The ALJ then asked whether the individual could find work if he was limited to being isolated with only occasional supervision, and the VE responded that all the jobs listed above would still apply. *Id.* at 74. The ALJ then asked if an individual with no interaction with the public or co-workers and only occasional supervision could find work, and the VE stated that such an individual could still work as an office cleaner. *Id.* at 74-75.

**D. Administrative Law Judge's Decision**

On February 27, 2014, the ALJ determined that Dismuke was not disabled and denied his

5

application for SSI benefits.  *Id.* at 10-24.  The ALJ found that Dismuke had not engaged in substantial gainful activity and had severe impairments of cervical radiculopathy, right upper extremity paresthesias, bipolar disorder, major depressive disorder, and post-traumatic stress disorder.  *Id.* at 15.  The ALJ found that Dismuke's HIV was not severe, finding that impairments related to HIV did not significantly limit Dismuke's ability to perform work.  *Id.* at 16.  The ALJ stated that Dismuke's viral load had "become undetectable."  *Id.* at 15.

At step three of the disability analysis, the ALJ determined that Dismuke did not have "an impairment or combination of impairments that met or medically equaled the severity" of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *Id.* at 16.  The ALJ specifically compared Dismuke's mental impairments against Listing 12.04 and 12.06.  *Id.*  The ALJ found that Dismuke had moderate restrictions in daily living and regarding concentration, persistence, and pace.  *Id.* at 17.  Regarding social functioning, the ALJ stated that Dismuke had moderate difficulties, noting that Dismuke "attended meetings," and had a close relationship with his mother, stepfather, two nieces, and a nephew.  *Id.*  The ALJ found that Dismuke had no episodes of decompensation of extended duration.  *Id.*  The ALJ found that Dismuke retained the residual functional capacity ("RFC") to perform medium work except with no interaction with the public and coworkers and with occasional supervision, and limited to simple, routine, and repetitive tasks.  *Id.* at 18.

The ALJ determined that Dismuke had no work history, was defined as a younger individual, and that Dismuke was able to work as an office cleaner, janitor, or laundry worker.  *Id.* at 22-23.  The ALJ therefore found Dismuke had not been under a disability since the date of his application.  *Id.* at 23.

Upon learning of the ALJ's denial, Dismuke requested a review of the decision.  *Id.* at 7–9.
The Appeals Council denied Dismuke's request on June 20, 2014, transforming the ALJ's denial into
the final decision of the Commissioner.  *Id.* at 1–6.  On August 29, 2014, Dismuke filed a complaint
before this court to appeal the Commissioner's decision.  Dkt. 1.

## II. Legal Standard

The court's review of a final decision by the Commissioner denying disability benefits is
limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating the
record; and (2) substantial evidence in the record supports the decision.  *Waters v. Barnhart*, 276
F.3d 716, 718 (5th Cir. 2002).

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is
disabled within the meaning of the Act.  *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under
the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial
gainful activity by reason of any medically determinable physical or mental impairment . . . which
has lasted or can be expected to last for a continuous period of not less than twelve months."  42
U.S.C. § 423(d)(1)(A); *see also Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  The
existence of such a disabling impairment must be demonstrated by "medically acceptable clinical
and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A) *see also Jones v. Heckler*, 702
F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity,"
the regulations provide that disability claims should be evaluated according to the following
sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform her previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

*Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); *see also* 20 C.F.R. § 404.1520. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. *Greenspan*, 38 F.3d at 236.

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.* The Commissioner has the responsibility of deciding any conflict in the evidence. *Id.* If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. *Id.*

8

### III. ANALYSIS

In his motion for summary judgment, Dismuke argues that the ALJ erred by finding Dismuke's HIV to be non-severe and by finding that his mental impairments did not meet a Listing. Dkt. 17 at 3. The Commissioner argues that the ALJ's decision was supported by substantial evidence.

Dismuke argues that the ALJ erred by finding his HIV to be non-severe for several reasons. Dismuke notes that the ALJ's repeated assertions that his HIV viral load had become "undetectable" were made in error, and that the record reflects, to the contrary, that Dismuke's HIV worsened during the relevant period in February 2013. Dismuke further notes that although the ALJ cites *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), he thereafter cited an incorrect standard. In *Stone*, the Fifth Circuit explained that an impairment can be considered non-severe only if it is such a slight abnormality that it would not be expected to interfere with the individual's ability to perform work, irrespective of age, education, or work experience. *Id.* at 1101. By contrast, the ALJ stated that HIV was not a severe impairment because it did not "significantly limit" Dismuke's ability to perform work-related activities. Tr. at 16. This is not the *Stone* standard.

In response, the Commissioner admits that the ALJ's use of the term "undetectable" was erroneous, but argues that the ALJ's intent was to show Dismuke's improvement during the relevant period. The Commissioner additionally argues that medical evidence supports the ALJ's findings. The Commissioner alleges that while Dismuke did complain of side effects, they were all outside the relevant period and were correctly ignored by the ALJ. The Commissioner argues that even if the ALJ were incorrect in the standard he applied, the issue is irrelevant because the ALJ found at least one of Dismuke's conditions to be severe.

The court agrees that the ALJ incorrectly stated throughout his opinion that Dismuke's HIV viral load had "become undetectable." Upon review of the record, it is clear that treatment notes list an undetectable viral load as a goal, not as something that actually occurred. Tr. 4490 ("[T]his patient's treatment goal is: VL undetectable"). To the contrary, within the relevant period, Dismuke saw his viral load increase substantially in February 2013, only to be controlled by medication upon follow-up visits.

Further, although the Commissioner argues that the ALJ correctly considered Dismuke's side effects, the court can find only one reference to side effects in the ALJ's determination of the severity of Dismuke's impairments, wherein he stated that Dismuke denied having diarrhea but noted his bowel movements were "irregular." *Id.* at 15, 1120. The ALJ did not address that following the visit where Dismuke denied diarrhea, his medication was changed to better treat his HIV, and that Dismuke stated at the hearing that diarrhea was a side effect of his HIV medication. *Id.* at 37. The ALJ additionally noted in his RFC analysis that Dismuke stated he experienced fatigue, nausea, and acid reflux, but that the acid reflux was "relieved with over-the-counter medications." *Id.* at 19. In the hearing, Dismuke noted that his primary issue was chronic diarrhea, and further stated that medications worked "sometimes" to treat his acid reflux, and the ALJ asked in response if acid reflux was "just going to be a side effect of that medication." *Id.* at 37–38.

It appears that the ALJ did not consider Dismuke's medication side effects when evaluating whether HIV was a severe impairment. The Listing section related to immune system disorders notes that "the symptoms of HIV infection and the side effects of medication may be indistinguishable from each other. We will consider all of your functional limitations, whether they result from your symptoms or signs of HIV infection or the side effects of your treatment." Listing

14.00(G)(1)(h)(5).  Dismuke did experience symptoms that should have been considered by the ALJ in determining whether his HIV was severe.

Dismuke is also correct that the ALJ cites the incorrect standard in stating that Dismuke's HIV did not "significantly" limit his ability to work.  Under the correct standard, any interference with Dismuke's ability to work would classify HIV as a severe impairment.  *See Stone*, 752 F.2d at 1101.  As Dismuke testified to experiencing multiple side effects that would cause non-exertional limitations, substantial evidence does not support the ALJ's finding that HIV was not a severe impairment.

Although Dismuke claims the ALJ's failure to use the proper legal standard does not require a showing of prejudice and automatically necessitates remand, the Commissioner responds that any such error was harmless because the ALJ found at least one severe condition and continued in his analysis.  The Commissioner is correct that following recent Fifth Circuit decisions, the court does not automatically remand for failure to follow the proper *Stone* standard, absent a showing that a plaintiff is harmed by the error.  *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (holding that "procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected"); *Phillips v. Colvin*, No. G-12-234, 2015 WL 1876236, at *3 (S.D. Tex. Apr. 21, 2015) (applying *Audler*); *see also McDaniel v. Colvin*, No. 4:13-cv-989-O, 2015 WL 1169919 (N.D. Tex. Mar. 13, 2015) (citing *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012)).  Legal error is found to be harmless when it is "inconceivable that a different administrative conclusion would have been reached absent the error."  *Walker v. Colvin*, No. H-12-2463, 2014 WL 4167017, *4 (S.D. Tex. Aug. 20, 2014) (citing *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006)).

Here, the ALJ's error in finding Dismuke's HIV to be non-severe meant that he did not consider any auto-immune system disorder Listing. The ALJ therefore did not discuss Dismuke's loss of forty pounds, or over ten-percent of his baseline weight, in connection with Listing 14.08(H). Because the ALJ could have found that Dismuke's HIV met a Listing, his application of an incorrect legal standard was not harmless.

Dismuke additionally argues that the ALJ erred in the evaluation of his mental impairments. The ALJ found that Dismuke had "moderate" difficulties in social functioning, based on his attendance at meetings and his close relationship with several family members, and found no evidence of any episodes of decompensation. Tr. at 17.

The Commissioner argues that the record shows that Dismuke never had any history of suicidal ideation or signs of any delusions or decompensation during the relevant period, and that substantial evidence supports the ALJ's decision. Dkt. 23 at 3-4. In his analysis, the ALJ cited hospital records stating that Dismuke was hospitalized on March 13, 2013, for "substance abuse mood disorder and intoxication," and that he "did not experience any hallucinations, paranoia or delusions." Tr. at 21. The ALJ failed to acknowledge evidence that Dismuke was intoxicated secondary to a suicide attempt, experienced suicidal and homicidal ideation, and reported recent auditory hallucinations. *Id.* at 4415. The Commissioner is therefore incorrect in her argument that Dismuke never suffered from any suicidal or homicidal thoughts during the relevant period. *See* Dkt. 23 at 3. Further, the ALJ did not consider whether this suicide attempt and Dismuke's ensuing admittance into a drug treatment clinic constituted an episode of decompensation. Consequently, the ALJ's finding that there was no evidence of decompensation, absent a mention of Dismuke's

suicide attempts, voluntary admittance into drug a treatment facility, and history of incarceration, is not supported by substantial evidence.

Similarly, the ALJ's finding that Dismuke suffers from moderate difficulties in social functioning is not supported by substantial evidence. If an ALJ determines that a claimant has a medically determinable impairment, he must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings in accordance with [§ 404.1520a(e) ]." 20 C.F.R. § 404.1520a(b)(1). Here, the ALJ does not rely on expert testimony or the opinion of any treating or non-treating physician for his finding that Dismuke was moderately limited in social functioning, instead citing to Reed's note that Dismuke "attended meetings," although elsewhere the ALJ noted that Reed stated that Dismuke's overall prognosis was "poor" and that he suffered from antisocial personality disorder. *Id.* at 17, 21-22. The ALJ gave Reed's opinion "some" weight, stating that it was consistent with the medical evidence of record. However, in his analysis, the ALJ ignores Reed's opinion that Dismuke suffered from extreme limitations in every area of social functioning. *Id.* at 4525. Similarly, the ALJ does not explain how Dismuke, who suffers from antisocial personality disorder, paranoid thoughts, and anger management issues, and who has engaged in frequent, violent outbursts against authority figures, including outbursts that caused him to go to prison, suffered from only moderate, rather than marked or extreme, restrictions in social functioning.

The Commissioner argues that even if Dismuke's arguments are meritorious, substantial evidence supported the ALJ's determination that Dismuke's limitations failed to meet Listing 12.04 or 12.06. Listings 12.04 requires a finding of either both (A) and (B) or a finding of (C):

13

(A) Medically documented persistence of various symptoms of depression, mania, or bipolar disorder;

AND

(B) At least two of the following:

> (1) Marked restriction in activities of daily living; or
> (2) Marked difficulties in maintaining social functioning; or
> (3) Marked difficulties in maintaining concentration, persistence, or pace; or
> (4) Repeated episodes of decompensation, each of extended duration;

OR

(C) Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and one of the following:

> (1) Repeated episodes of decompenstion, each of extended duration; or
> (2) A residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

*See* Listing 12.04. Listing 12.06 is similar, except it requires either both A and B or A and C; the symptoms in A relate to anxiety; and C simply requires that the symptoms in A result in "a complete inability to function independently outside the area of one's home." Listing 12.06.

The Commissioner is correct that although the ALJ erred by not discussing Dismuke's suicide attempt in the context of episodes of decompensation and by finding his ability to maintain social functioning to be only moderately limited, these errors are insufficient to find that the ALJ

14

should have found that Dismuke's limitations met or exceeded Listing 12.04 or 12.06. Dismuke has established only that he was markedly limited in one area and suffered at most one episode of decompensation. *See* Listing 12.04, 12.06. However, the ALJ's errors regarding Dismuke's mental limitations, in combination with his decision to find Dismuke's HIV to be a non-severe impairment, constitutes reversible error. While the Commissioner is correct that Dismuke cannot meet any Listing related to mental impairments because his limitations are only marked in one area, the ALJ did not consider this limitation in the context of auto-immune disorders. For example, Listing 14.08(K) requires repeated manifestations of HIV infection at levels below other HIV Listings, along with marked limitations in activities of daily living, social functioning, or inability to maintain concentration, persistence, or pace. Because it is conceivable that the ALJ could have found Dismuke met Listing 14.08(K) absent the ALJ's improper finding that Dismuke's HIV was not a severe impairment, this court finds the ALJ committed reversible error.

## IV. CONCLUSION

Dismuke's motion for summary judgment (Dkt. 17) is **GRANTED** and the Commissioner's cross-motion for summary judgment (Dkt. 20) is **DENIED**. The case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion. The court will enter a separate judgment consistent with this order.

Signed at Houston, Texas on March 29, 2016.

Gray H. Miller
United States District Judge